The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TANYA GOODMAN,

                    Plaintiff,

         v.

FIRST UNUM LIFE INSURANCE
COMPANY and UNUM GROUP,

                    Defendants.

CASE NO. 2:21-cv-00902-BJR

**ORDER GRANTING IN PART
PLAINTIFF TANYA
GOODMAN'S MOTION FOR
JUDGMENT ON THE RECORD**

This matter comes before the Court on the cross-motions for judgment on the record under

Federal Rule of Civil Procedure 52 by Defendants First Unum Life Insurance Company and Unum

Group (collectively, "Unum"), Dkt. No. 31, and Plaintiff Tanya Goodman, Dkt. No. 33, and on

Goodman's motion to supplement the record. Dkt. No. 34. The Court GRANTS IN PART

Goodman's motion for judgment on the record, GRANTS her motion to supplement the record,

and DENIES IN PART Unum's motion for judgment on the record. The Court hereby REMANDS

the matter to Unum to determine whether Goodman can "perform the duties of any gainful

occupation for which [she is] reasonably fitted by education, training or experience," pursuant to the relevant benefit plan. Dkt No. 18-11 at 16.

## BACKGROUND

Goodman claims that Section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), warrants judgment against Unum for failure to pay her disability insurance benefits to which she was entitled under her employer's benefit plan ("the Plan"). Dkt. No. 1 at 4. Goodman also claims that Unum violated the terms of the Plan and seeks an injunction under 29 U.S.C. § 1132(a)(3) "compelling Unum to correct its claims-handling policies, practices, training, and procedures, together with any other declaratory or equitable relief the Court deems appropriate." Dkt. No. 1 at 5.

"Under ERISA, the proper standard of review of a plan administrator's benefits denial is *de novo* unless the plan grants discretionary authority to the administrator." *Mirick v. Prudential Ins. Co. of Am.*, 100 F. Supp. 3d 1094, 1096 (W.D. Wash. 2015) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). The parties have stipulated to de novo review. Dkt. No. 13 at 2. The court accepts the parties' stipulation, *see Rorabaugh v. Cont'l Cas. Co.*, 321 F. App'x 708, 709 (9th Cir. 2009), conducts a trial of this matter under Rule 52 based on the administrative record considered by Unum, and issues the findings of fact and conclusions of law as set forth below.

## GOODMAN'S MOTION TO SUPPLEMENT THE RECORD

As an initial matter, the Court addresses Goodman's motion to supplement the administrative record to add a June 24, 2022 decision by an administrative law judge ("ALJ") at the Social Security Administration ("SSA"), granting her Social Security disability benefits. Dkt. No. 34 at 1; *see* Dkt. No. 34-4 (2022 SSA decision). The Court has discretion to expand the record where "additional evidence is necessary to conduct an adequate de novo review of the benefit

decision." *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 944 (9th Cir. 1995); *see also Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094 (9th Cir. 1999). The following circumstances should be considered when deciding whether supplementing the administrative record is necessary:

> [C]laims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process.

*Opeta v. Northwest Airlines Pension Plan for Cont. Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007) (citation omitted).

The *Opeta* factors support expanding the record to include the 2022 SSA decision. The SSA's prior decision in 2020 already forms part of the administrative record, Dkt. No. 17-6 at 38–51, and the 2022 SSA decision results from this Court's decision reversing and remanding the 2020 decision. *See Tanya G. v. Comm'r of Social Security*, C21-0530-SKV, 2022 WL 35494, at *1 (W.D. Wash. Jan. 3, 2022). The 2022 SSA decision was issued after the administrative record was filed, so it could not have been included in it. And this case certainly requires consideration of complex medical questions and issues regarding the credibility of medical experts, which are matters that the 2022 SSA decision speaks to. In light of the record and circumstances in this case, the Court grants Goodman's motion to supplement the record with the 2022 SSA decision. Dkt. No. 34-4.

The Court next turns to the parties' cross-motions for judgment on the record.

**FINDINGS OF FACT**

**A.      Goodman's Employment and the Terms of Coverage Provided Under the Plan**

(1) Goodman worked as a Vice President Group Account Director for Aegis Media Americas, Inc.'s iProspect division. Dkt. No. 16-10 at 24, 27. She held an executive leadership role where she was responsible for the strategic management of clients' digital marketing programs and managed a $6,000,000 revenue stream. Dkt. No. 16-7 at 39; Dkt. No. 16-19 at 5. She handled accounts for companies such as T-Mobile and led a team of 20 employees. Dkt. No. 16-6 at 1; Dkt. No. 16-7 at 39. Before she requested disability benefits, her annual income was $202,878. Dkt. No. 18-12 at 28.

(2) Goodman participated in her employer's ERISA plan, the Aegis Media Americas, Inc. Plan. Dkt. No. 7 at 1–2; Dkt. No. 16 at 1. The Plan includes a disability insurance policy written by First Unum Life Insurance Company. Dkt. No. 18-11 at 1–42. Goodman was covered under the Plan's short-term disability ("STD") benefits, which are paid for up to 26 weeks. Dkt. No. 18-12 at 28; Dkt No. 18-17 at 15. Goodman was also covered under the Plan's long-term disability ("LTD") benefits, which begin after a Plan participant's STD benefits end. Dkt. No. 18-11 at 4–5.

(3) The Plan defines disability as follows:

You are disabled when Unum determines that:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

You must be under the regular care of a physician in order to be considered disabled.

Dkt. No. 18-11 at 16 (emphasis omitted). The Plan thus identifies two different standards: one that applies up to 24 months of payments, and one that applies after 24 months of payments. Unum did not evaluate Plaintiff's disability claim under the Plan's more stringent "any gainful occupation" standard because it determined that Goodman was unable to meet the less stringent "regular occupation" standard. Dkt. No. 31 at 3 n.5. The Plan also limits the maximum benefits available for mental illness to 24 months. Dkt. No. 18-11 at 22.

(4) Unum acts as the plan administrator for deciding LTD claims. *Id.* at 38. The key terms in the Plan's definition of disability are defined as follows:

"Sickness" means "an illness or disease;"

"Injury" means "a bodily injury that is the direct result of an accident and not related to any other cause;"

"Limited" means "what you cannot or are unable to do;"

"Material and Substantial Duties" mean duties that "are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified;"

"Regular Occupation" means "the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location;"

"Mental Illness" means "a psychiatric or psychological condition classified in the Diagnostic and Statistical Manual of Mental Health Disorders (DSM), published by the American Psychiatric Association, most current as of the start of a disability. Such disorders include, but are not limited to, psychotic, emotional or behavioral disorders, or disorders relatable to stress."

*Id.* at 30–32. The Plan also defined "Regular Care" as follows:

- you personally visit a physician as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s); and
- you are receiving the most appropriate treatment and care which conforms with generally accepted medical standards, for your disabling condition(s) by a physician whose specialty or experience is the most appropriate for your disabling condition(s), according to generally accepted medical standards.

*Id.* at 31.

ORDER GRANTING IN PART PLAINTIFF TANYA GOODMAN'S MOTION FOR JUDGMENT ON THE RECORD - 5

**B.      Goodman's Accident and Initial Treatment**

(5) On January 9, 2018, Goodman was rear-ended by another vehicle while driving her son to preschool. Dkt. No. 16-3 at 49. According to her providers' reports, the accident caused her head to strike the headrest, and she thought that she may have also struck her face, although she did not recall it. *Id.* at 4, 49. She reported experiencing dizziness, blurred vision, headache, and some ringing in her ears. *Id.* at 4, 49. She also believed that she may have briefly lost consciousness. *Id.* at 49, 62. At the time of the accident, the other vehicle was estimated to be moving at 30 miles per hour, Goodman was wearing a seatbelt, the airbags did not deploy, and she did not call the police or emergency services. *Id.* at 3–4. Her vehicle remained drivable, and she drove herself from the scene. *Id.* at 4, 15.

(6) Goodman first sought treatment from her chiropractor the day after the accident, January 10, 2018. *Id.* at 3. In a report dated March 9, 2018 summarizing the visit, the chiropractor noted Goodman's subjective reports of injuries of her head and back including hitting her head, tightness and discomfort in her neck and head, and dizziness, but no loss of consciousness. *Id.* at 3–4. The chiropractor's report noted that, "although subjective complaints are important," recommendations for chiropractic treatment "need to be predicated upon the presence of relevant objective examination findings," and the chiropractor was "unable to objectively substantiate the necessity for additional chiropractic treatment." *Id.* at 6. Other symptoms Goodman reported to various providers included forgetfulness, tingling and/or drooping on the right side of her face, nausea, and vomiting. *See, e.g.*, *id.* at 7–8 (reporting forgetfulness, nausea, and vomiting at a visit with her chiropractor on March 26, 2018); *id.* at 31 (noting numbness and drooping on the right side of her face on January 11, 2018). On a later visit to the chiropractor on March 26, 2018, she indicated that these symptoms became worse with exposure to light. *Id.* at 12. Following this visit, Dr. Garrett Hyman at Emerald Sports & Spine Medicine reported that he "continue[d] to suspect

1  a significant portion of [Goodman's] symptoms relate to 'adrenaline overload' from the

2  combination of her recent [accident] trauma as well as various psychosocial stressors." *Id.* at 7, 10.

3  He added that he did "not think she is likely to benefit from a focus on medications, injections or

4  surgery for her spinal or shoulder pain." *Id.* at 10.

5      (7) On January 11, 2018, Goodman visited her primary care doctor, who told her that she

6  likely had whiplash and a concussion. *Id.* at 31. The doctor referred her for an MRI and

7  recommended that she rest. *Id.* Two days later, Goodman visited an emergency room where she

8  received an MRI and was diagnosed with "[c]oncussion without loss of consciousness." *Id.* at 27.

9  She reported that she had dizziness that was so severe that she had to lean onto walls for support,

10  and that earlier on the day of the visit the vision in her right eye seemed like it had a "gray cotton

11  mesh" over it, although that symptom had already resolved. *Id.* at 62. Her MRI results were normal.

12  *Id.* at 29. The ER doctor concluded that she had a "normal neuro exam" and that her symptoms

13  "likely represent[ed] post-concussive syndrome." *Id.* at 64; *see id.* at 68 (describing Goodman as

14  having "classic post concussive symptoms").

15      (8) On February 19, 2018, Goodman consulted optometrist Dr. Rachael Barker and

16  received a vision evaluation. Dkt. No. 16-2 at 41. The vision assessment found that Goodman

17  suffered from severe convergence insufficiency, intermittent alternating exotropia, reduced depth

18  perception, accommodative insufficiency, and astigmatism. *Id.* Dr. Barker recommended single

19  vision lenses, UV protection, visual breaks of 60 seconds for every 10 minutes of near work,

20  limiting total daily screen time and small/near screens, and warmer color tones in the workspace.

21  *Id.* Dr. Barker strongly recommended weekly vision therapy "since visual deficits are severely

22  impacted," although she stated that she "would first like to see how [Goodman] progresses with

23  glasses and over [time] with other therapeutic interventions." *Id.*

24

ORDER GRANTING IN PART PLAINTIFF TANYA GOODMAN'S MOTION FOR JUDGMENT ON THE
RECORD - 7

(9) On March 27, 2018, Goodman was examined by neurologist Dr. Mark Fishel. Dkt. No. 16-3 at 49–53. Goodman reported symptoms similar to those she had reportedly previously, including headache, dizziness, blurred vision, soreness in her neck and upper back, and light sensitivity. *Id.* at 49–50. She also reported that she was irritable, anxious, and fatigued, and that she had pain in her right foot. *Id.* at 49, 51. At this time, she was pursuing several forms of treatment including hyperbaric oxygen treatment, acupuncture, massage, and craniosacral therapy. *Id.* at 49. She was also taking selenium, probiotics, CBD/THC, and Zofran. *Id.* at 50. Dr. Fishel identified her as having a "[s]low recovery process" and a "[p]ossible complex migraine episode." *Id.* at 52. Dr. Fishel examined Goodman's cranial nerves related to vision and found them to be normal. *Id.* at 51. Specifically, he found that, with respect to cranial nerve II, "[v]isual fields are full to confrontation and finger counting" and "[f]undoscopic exam is normal." *Id.* With respect to cranial nerves III, IV, and VI, he found "EOMI [extra ocular movement intact], PERRL [pupils equal and reactive to light], no ptosis [drooping eyelids], nystagmus [rapid uncontrollable eye movement]. NI saccades and smooth pursuits." *Id.* Dr. Fishel prescribed her Flexeril, a muscle relaxant, and suggested considering additional medications for headache prevention. *Id.* at 53. He said that Goodman "[n]eed[ed] to consider taking a leave of absence from work to focus on recovery." *Id.* Dr. Fishel also recommended a repeat MRI due to Goodman's continued report of decreased sensation on the right side of her face. *Id.* at 52. She received this second MRI on March 29, 2018, and it also came out normal. *Id.* at 58–59.

(10) Goodman had an initial consultation with neuropsychologist Dr. Martha Glisky on April 19, 2018. Dkt. No. 16-9 at 42. She again described a set of symptoms similar to those she had described to previous providers she had consulted, including sensitivity to light, ongoing nausea and vomiting for several weeks, headaches, and numbness and drooping on the right side of her face (which resolved shortly afterward). *Id.* 42–43. She reported that exposure to certain

types of light would trigger symptoms including nausea, vomiting, and feeling shaky. *Id.* at 43. She also described difficulty with memory and feeling that she was "not as sharp" as she was prior to the accident. *Id.* She said that she was working at 50-60% of the level she worked at before the accident and described feeling irritable, indifferent, depressed, and hopeless at times. *Id.* Dr. Glisky reported that Goodman "has continued to try to work," but that she and Goodman "discussed options that included taking some time off work or reducing her work hours to allow more time and space for treatment and continued healing." *Id.* at 44. Dr. Glisky assured Goodman "that most individuals will recover cognitively from this type of injury," and mentioned that a number of other stressors, including custody issues and her special needs son, were "likely contributing to a longer recovery time and to some of the persisting symptoms." *Id.*

(11) Goodman had a follow-up visit with Dr. Glisky on May 8, 2018. *Id.* at 39. In Dr. Glisky's report on the visit, she noted that Goodman had started physical therapy and massage and attended some vision therapy, and that she had been recommended for speech therapy and vestibular physical therapy. *Id.* at 40. Dr. Glisky noted that Goodman was "concerned about her ability to continue working" and that her providers "are also suggesting taking some time off." *Id.* at 41. She said that Goodman's "current contract ends at the end of May and seems to make sense in terms of when to break." *Id.* Dr. Glisky concluded that "taking a break from work would likely be beneficial for [Goodman's] continued healing and her own mental health," and that it would "be helpful for her to have three months to focus on her own recovery." *Id.* Dr. Glisky declined to conduct a neuropsychological evaluation at that time, but recommended considering it if Goodman continued to have difficulties after the therapies she was already planning. *Id.*

## C.   Goodman's Disability Claim

(12) Goodman continued working after the accident, although she missed some days of work each week. Dkt. No. 16-1 at 16. She requested STD benefits on April 30, 2018. Dkt. No. 18-

12 at 2, 21. Unum approved her request for STD benefits on June 5, 2018, with an effective start date of May 31, 2018. Dkt. No. 18-13 at 57. Unum found that Goodman was disabled based on post-concussion syndrome caused by her motor vehicle accident. Dkt. No. 18-12 at 10. In deciding to grant STD benefits, Unum considered a report from Dr. Fishel stating that Goodman could not perform her job due to visual impairments, headaches, and light sensitivity, and that she should avoid working through July 1, 2018. Dkt. No. 18-12 at 11, 36–37. Goodman stopped working on May 30, 2018 and received STD benefits from May 31, 2018 to July 1, 2018. Dkt. No. 18-13 at 57. Unum later approved Goodman for the full 26-week duration of STD benefits, which lasted until November 28, 2018. Dkt. No. 18-17 at 15.

(13) After Goodman's STD benefits were exhausted, Unum began investigating whether she was entitled to LTD benefits on October 29, 2018. Dkt. No. 18-17 at 15. On January 31, 2019, Unum notified Goodman of its conclusion that she was disabled and entitled to LTD benefits as of November 29, 2018. Dkt. No. 47 at 47, 51. Unum found Goodman disabled due to her headaches. *Id.* at 51. Unum continued paying LTD benefits until December 16, 2020, when it ceased benefits on the grounds that Goodman was no longer disabled. Dkt. No. 17-6 at 11–14.

**D.    Post-Claim Treatment and Medical Evaluations**

(14) Goodman continued receiving treatment after the commencement of her STD and LTD benefits. Goodman continued meeting with Dr. Fishel approximately once a month from May to October 2018. *See* Dkt. No. 16-3 at 54 (May 15, 2018 visit); Dkt. No. 18-15 at 27 (June 29, 2018 visit); *id.* at 66 (July 31, 2018 visit); Dkt. No. 16-1 at 80 (August 21, 2018 visit); Dkt. No. 16-2 at 2 (September 13, 2018 visit); *id.* at 6 (October 25, 2018 visit). Dr. Fishel identified her as having "[c]ontinued post-concussive symptoms" on May 15, 2018, and recommended Gabapentin and physical, cognitive, and vision therapy. Dkt. No. 16-3 at 56. Dr. Fishel treated her with a greater occipital nerve block on August 21, 2018 to help with her post-concussive visual

symptoms. Dkt. No. 16-2 at 1. Although she had a good response to the treatment, she experienced increased nausea. *Id.* at 17. On September 13, 2018, Dr. Fishel began treating her with Botox. *Id.* at 5. Goodman reported that the Botox helped decrease the frequency and intensity of her symptoms. *Id.* at 17; *see also* Dkt. No. 18-16 at 51 (describing improvement of symptoms with nerve blockers and Botox). Goodman also commenced vision therapy with Dr. Barker, although she discontinued the therapy because she could not tolerate the driving. Dkt. No. 16-15 at 22.

(15) On June 3 and 6, 2019, Goodman returned to Dr. Glisky for a neuropsychological evaluation. *See* Dkt. No. 47 at 91–92; 16-11 at 1–8. Dr. Glisky found that Goodman "appeared to put forth good effort throughout the evaluation" that she "passed the majority of the formal and embedded measures of effort, motivation, and performance validity," and that she "met validity standards." *Id.* at 3. Her IQ score was average but she scored as mildly impaired on a test of attentional speed, and moderately impaired when required to divide her attention on additional tasks. *Id.* Her overall processing speed was average, but her overall measures of learning and memory were "below expectation." *Id.* She was intact on some measures of executive function, but her abstract reasoning performance was reduced. *Id.* at 5. Dr. Glisky concluded that Goodman met the criteria for Unspecified Neurocognitive Disorder "with evidence of reduced cognition in several areas," and met criteria for Unspecified Depressive Disorder and Unspecified Anxiety Disorder. *Id.* Dr. Glisky concluded that Goodman's cognitive difficulties were "likely due to [a] combination of factors including the injury to her brain, combined with the overall traumatic event and consequences, as well as her ongoing stress and psychological distress." *Id.* at 6. Dr. Glisky recommended medical follow up for her physical symptoms, including with a neuroendocrine specialist, as well as regular psychotherapy for her psychological disorders. *Id.* She also recommended that Goodman "not return to her previous level of occupation functioning" because her "cognitive, physical, and emotional symptoms will make it very difficult for her to successfully

perform her job, and the stress will not be good for her continued recovery." *Id.* Dr. Glisky recommended that she take another three to six months of leave. *Id.* Dr. Glisky also recommended that Goodman pursue cognitive remediation therapy at some point in the future but to "prioritize her physical and emotional healing" first. *Id.*

(16) On September 18, 2019, Goodman took a Community Safety Evaluation at Evergreen Hospital and was diagnosed with "visual perceptual impairment." Dkt. No. 16-15 at 22. She presented wearing sunglasses that she reported wearing "pretty much all the time." *Id.* She reported that her symptoms increased dramatically with freeway and longer distance driving as well as bright light, headlights, and rain. *Id.* The hospital found that she suffered from convergence insufficiency, recommended that she resume vision therapy, and suggested that she "should limit/avoid driving freeways, long distances, during heavy traffic times, adverse weather conditions, and limit radio or conversations while driving." *Id.* at 22–23. It also found that she demonstrated "mild cognitive impairment . . . most likely related to reports of visual fatigue which [consequently] increases [headache] pain." *Id.* at 23. Goodman reported experiencing nausea and headaches during the testing. *Id.* at 22.

(17) Goodman was evaluated for visual disability by optometrist Dr. Theodore Kadet on December 9, 2019, January 30, 2020, and February 4, 2020. Dkt. No. 16-16 at 25. Dr. Kadet found that Goodman suffered weaknesses in ocular motility, with two of the four "visually-based skills critical to reading fluency" measuring at the third grade performance level, one skill measuring at the fifth grade level, and the final one measuring at the college level. *Id.* at 27. Goodman's grade level efficiency score measured at a third grade level. *Id.* Dr. Kadet also found that Goodman suffered from convergence insufficiency and that the condition was "contributing to the Overall Reading Difficulties, Dizziness, and Visual Short Term Memory losses" he identified. *Id.* at 28. Dr. Kadet concluded that "[o]n a more probably than not basis," the convergence insufficiency

was a result of "Cranial Nerve III dysfunction, a result of Diffuse Axonal Injury and shearing of capillaries from branches off of the Basilar Artery to the Cranial Nerve III nuclei – a sequela of coup-contrecoup shaking of brain and other tissue inside the skull" at the time of Goodman's accident. *Id.* Dr. Kadet also conducted a "Visual Evoked Potential (VEP)" test, which "is performed to assess neurological integrity and function between the retina of the eye and the visual cortex of the brain." *Id.* at 29. Dr. Kadet's findings from the test were "highly suggestive of neurological damage to the visual mechanism." *Id.* Dr. Kadet recommended "Neuro-Optometric Rehabilitation/Vision Therapy" to restore normal binocular function and estimated that the vision therapy would take about eight to eleven months. *Id.* Dr. Kadet concluded that the convergence insufficiency, reading difficulties, ocular motility dysfunctions, and other visual losses were "caused on a more probably than not basis" by the accident. *Id.* at 30. He also believed that Goodman's condition could be successfully treated with vision therapy. *Id.*

### E.    Unum's Termination of Benefits and Goodman's Appeal

(18) On September 10, 2019, Unum sent Goodman a letter stating that it had determined that she was subject to the policy limitations for mental health conditions, which limited her to a maximum of 24 months of benefits. Dkt. No. 16-13 at 44; *see* Dkt. No. 18-11 at 22. Unum informed Goodman that her current benefits would reach their "maximum duration" on November 28, 2020. Dkt. No. 16-13 at 44. It identified her as having "symptoms of significant Anxiety and Depression" and stated that "the reported severity of [her] symptoms warrant[ed] a psychiatric evaluation to consider appropriate psychotropic medication" as well as weekly cognitive behavioral psychotherapy. *Id.* Based on Dr. Glisky's records, it affirmed the onset of Goodman's symptoms as May 31, 2018, her last day of work. *Id.* Unum found her prognosis for improvement to a level that would allow her to return to work within six to nine months to be "fair-good" with regular and appropriate treatment. *Id.* Unum also found that Goodman's care was "not meeting the standards

of the policy," and directed her to schedule an appointment with a psychiatrist and a psychotherapist within 45 days of the letter. *Id.* at 44–45. It explained that if she did not comply, she would not be meeting the standard of care required by the policy and it would result in the closure of her claim. *Id.* at 45.

(19) Unum continued its investigation of Goodman's claim by contacting her medical providers to assess her disability. It sent questionnaires to Dr. Fishel and Dr. Kadet asking whether Goodman could perform certain occupational demands. On March 11, 2020, Unum sent a questionnaire to Dr. Kadet asking if Goodman could fulfill the following demands: "[l]ifting, carrying, pushing, pulling up to 10 pounds occasionally, mostly sitting, standing or walking for brief periods of time, the ability to interact with the public, make judgments and decisions, plan the activities of others, and supervise staff." Dkt. No. 16-16 at 59. Dr. Kadet wrote that he was "not qualified to provide the response below." *Id.* On March 11, 2020 and August 7, 2020, it sent a similar questionnaire to Dr. Fishel. Dkt. No. 16-16 at 51; Dkt. No. 16-23 at 46. In his response to the March 2020 questionnaire, Dr. Fishel stated that Goodman could not perform the above occupational demands on a full-time basis due to "dizziness related to her [traumatic brain injury]" and that he would reassess in six months. Dkt. No. 16-16 at 55. Dr. Fishel later opined that, as of August 7, 2020, Goodman was able to fulfill the following demands on a full-time basis: "[l]ifting, carrying, pushing, and pulling 10 pounds occasionally, mostly sitting, and standing or walking for brief periods of time." Dkt. No. 16-23 at 46. Dr. Fishel confirmed in a follow-up questionnaire on December 14, 2020 that nothing had changed since his prior response in August 2020. Dkt. No. 17-13 at 44.

(20) On December 16, 2020, Unum found that Goodman was no longer disabled and ceased paying her LTD benefits. Dkt. No. 17-6 at 11. Unum based its denial on reports from medical consultants Dr. Andrea Brown and Dr. Jamie Lewis, who reviewed the medical information in

Goodman's file. *See* Dkt. No. 17 at 53–55 (Brown Report), 58–60 (Lewis Review); Dkt. No. 17-5 at 78–80 (Brown Addendum), 83–84 (Second Lewis Review). On November 6, 2020, Dr. Brown issued a report stating that "[w]ithin a reasonable degree of medical certainty, the sum of the available medical information" did not support Goodman's lack of "full-time sustained functional capacity to perform her own occupational demands." Dkt. No. 17 at 54. After reviewing additional information in Goodman's file, Dr. Brown reaffirmed that conclusion on December 9, 2020.; Dkt. No. 17-5 at 79. The occupational demands Dr. Brown considered included: "occasional exertion up to 10 pounds; mostly sitting with brief periods of standing or walking; frequent near visual acuity; occasional color vision; interacting with the public; making judgments and decisions; planning the activities of others; and supervising staff." *Id.*; Dkt. No. 17 at 54. Dr. Brown opined that:

> Claimant's activities are consistent with an ability to perform the physical, visual and cognitive occupational demands outlined above. Claimant is able to compose thoughtful, relevant and grammatically correct social media posts, care for and home school her 5-year-old special needs child as a single mom with shared custody, watch movies, use her smart phone to keep in touch with family and friends, do yoga at home, perform ADLs, do some reading, drive, and shop at Trader Joe's and Costco.

Dkt. No. 17 at 54; Dkt. No. 17-5 at 79. Dr. Lewis concurred with Dr. Brown's November and December 2020 findings, noting the "clinical improvement, limited exam and diagnostic findings and stable and limited ongoing treatment." Dkt. No. 17 at 58; Dkt. No. 17-5 at 83.

(21) Goodman internally appealed Unum's termination of her LTD benefits on January 13, 2021. Dkt. No. 17-6 at 23–24. In support of her appeal, Goodman submitted three new documents to Unum: (i) a visual impairment questionnaire in which Dr. Kadet indicated that she could rarely perform work activity involving near acuity and had a "fragile visual system," (ii) a copy of Dr. Kadet's previous visual system evaluation report based on examinations in early 2020, and (iii) an

October 26, 2020 decision by an administrative law judge in the Social Security Administration crediting Dr. Kadet's opinion as to her limited reading ability. *Id.* at 26–51.

(22) Unum denied Goodman's appeal on May 4, 2021. Dkt. No. 20-11 at 93; Dkt. No. 20-12 at 1–14. In denying her appeal, Unum relied on a report from Dr. Scott Norris. Dkt. No. 20-12 at 5–7; Dkt. No. 20-7 at 37–42. Dr. Norris concluded that the medical records did not support Goodman being unable to fulfill her occupation demands on a full-time basis. Dkt. No. 20-7 at 41. He acknowledged Goodman's reported symptoms, but asserted that "[c]ontemporaneous examination findings were limited and were not [consistent with] the severe level of impairment" reported. *Id.* "Diagnostic testing/imaging did not identify structural disease or other pathologic conditions" consistent with the "severity of functional loss" Goodman reported, and that Goodman's "report of progression in visual disturbance months/years after a minor [motor vehicle accident] was not [consistent with] the natural course of [symptoms] and findings following a possible mild head injury." *Id.* at 40, 41. Dr. Norris noted that given the severe visual symptoms and only marginal improvement despite protracted visual therapy, "the lack of referral to Ophthalmology was not [consistent with] significant clinical or functional concern regarding the severity of her visual dysfunction." *Id.* at 41. Dr. Norris concluded that he did not find support for the limitations identified by Dr. Kadet, and that he would attempt to contact Dr. Kadet. *Id.* at 41–42. Dr. Norris expressed doubt about Dr. Kadet's reasoning for the following reasons:

> Dr. Kadet noted that [Goodman] experienced severe convergence insufficiency and was unable to maintain convergence over sustained periods of time. In several Visual Disability Reports, Dr. Kadet noted severely "receded" near point of convergence; however, measurements of convergence (e.g. point of fusion break, point of recovery) were rarely documented. . . . I did not find recent documentation of near visual acuity. Near point of convergence was "24/30", or approximately 60-75 cm, (NL < 10 cm). This level of profound convergence dysfunction was inconsistent with [Goodman's] report of participating in multiple visual tasks such as doing paperwork, helping her child w[ith] schoolwork, using a computer, seeing dashboard instruments while driving, and participating in multiple video sessions for Visual Therapy in early to mid-2020. . . . In Aug[ust] 2020, Dr. Kadet noted that

ORDER GRANTING IN PART PLAINTIFF TANYA GOODMAN'S MOTION FOR JUDGMENT ON THE RECORD - 16

[Goodman] had a "midline shift" on exam, although diagnostic support for consistent functionally significant midline shift was not apparent, based on the insured's reported activities.

*Id.* at 39. Although Unum sent a letter to Dr. Kadet describing its disagreement with his opinion, he never responded. *Id.* at 44–47.

## CONCLUSIONS OF LAW

**A.    Legal Standard**

(1) Under de novo review, the plan administrator's (here, Unum's) decision receives no deference, and the Court decides for itself whether the claimant is disabled. *Bunger v. Unum Life Ins. Co. of Am.*, 299 F. Supp. 3d 1145, 1157 (W.D. Wash. 2018) (citing *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010)); *accord Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1186 (9th Cir. 2022). "In reviewing the administrative record and other admissible evidence, the court evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate." *Anderson v. Liberty Mut. Long Term Disability Plan*, 116 F. Supp. 3d 1228, 1237 (W.D. Wash. 2015) (cleaned up). In this de novo context, the burden of proof is on the claimant—here, Goodman—to prove that she is disabled by a preponderance of the evidence. *Bunger*, 299 F. Supp. 3d at 1157 (citing *Muniz*, 623 F.3d at 1294, and *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1162–63 (9th Cir. 2016)).

(2) To make its de novo benefits determination, the Court must conduct a bench trial on the administrative record under Federal Rule of Civil Procedure 52, where it makes factual findings, evaluates credibility, and weighs evidence. *Anderson*, 116 F. Supp. 3d at 1231. Unlike in summary judgment motions under Rule 56, where district courts are tasked with deciding whether there is a genuine issue of material fact, here the Court must decide whether the plaintiff is disabled within the terms of the policy, and "can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Kearney*, 175 F.3d at 1095. In addition, the Court's review is

1    limited to the evidence that was before the plan administrator except in certain circumstances, such

2    as when it is clear that additional evidence is needed to conduct an adequate de novo review.

3    *Collier*, 53 F.4th at 1186 (citing *Opeta*, 484 F.3d at 1217; *Mongeluzo*, 46 F.3d at 943).

4    **B.    Goodman Is Disabled Under the Plan**

5           (3) The parties dispute whether Goodman is "disabled" as defined by the Plan. Dkt. No.

6    31 at 3; Dkt. No. 33 at 14. The Court concludes that she is. Goodman qualifies as disabled under

7    the Plan if she is limited from performing the material and substantial duties of her regular

8    occupation due to sickness or injury. Dkt. No. 18-11 at 16. Goodman held an executive

9    management role that would typically require frequent and prolonged visual tasks such as

10   reading, writing, and computer use. Unum agreed that the role required "frequent near acuity."

11   Dkt. No. 17 at 15. Such a role also has high cognitive demands: it is skilled work requiring the

12   ability to interact with the public, make judgments and decisions, plan the activities of others,

13   and supervise staff." *Id.*

14          (4) The record reflects that Goodman is unable to exercise frequent near acuity vision on a

15   full-time basis, as would typically be required of someone in her role. From the first days after her

16   accident, Goodman reported vision difficulties. *See* Dkt. No. 16-3 at 4, 49, 64(reporting dizziness

17   and blurred vision at provider's visits in the first week after the accident). At her emergency room

18   visit, she was assessed with post-concussive syndrome symptoms. *Id.* at 64. On February 19, 2018,

19   just over a month after the accident, Dr. Barker diagnosed Goodman with severe convergence

20   insufficiency, intermittent alternating exotropia, reduced depth perception, accommodative

21   insufficiency, and astigmatism. Dkt. No. 16-2 at 41. Dr. Barker stated that her "visual deficits

22   [were] severely impacted." *Id.*

23          (5) Goodman's reports of visual symptoms remained consistent thereafter, as did her

24   providers diagnoses of visual impairment. This contradicts Unum's suggestion that Goodman's

1   medical history is one of progressive deterioration over time. *See* Dkt. No. 31 at 16–17. In March

2   2018, she reported dizziness and blurred vision to Dr. Fishel. Dkt. No. 16-3 at 49. In September

3   2019, the Community Safety Evaluation at Evergreen Hospital found that she had "visual

4   perceptual impairment." Dkt. No. 16-15 at 22. In late 2019 and early 2020, Dr. Kadet evaluated

5   Goodman for visual disability and found that she continued to suffer from convergence

6   insufficiency, ocular motility dysfunction, and reading difficulties, and that these difficulties were

7   more likely than not caused by the accident. Dkt. No. 16-16 at 30. In the report submitted with

8   Goodman's internal appeal, Dr. Kadet again opined that Goodman had a "fragile visual system"

9   and that she could rarely perform work activity involving near acuity. Dkt. No. 17-6 at 27, 28.

10  "Subjective complaints of disabling conditions are not merely evidence of a disability, but are an

11  important factor to be considered in determining disability." *Bigham v. Liberty Life Assurance Co.*

12  *of Boston*, 148 F.Supp.3d 1159, 1167 (W.D. Wash. 2015) (alteration omitted) (quoting *Miles v.*

13  *Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013)); *see id.* ("[S]ubjective symptoms have

14  been found in previous cases to be valuable evidence for a disability claim.").

15      (6) Unum contends that "updated medical information" prompted it to reevaluate

16  Goodman's eligibility for ongoing LTD benefits, Dkt. No. 31 at 10, but the record evidence does

17  not support Unum's position. To cast doubt on Goodman's claim, Unum relies heavily on the

18  questionnaire responses provided by Dr. Fishel and Dr. Kadet in March and August 2020.

19  However, the responses do not show what Unum claims. The August 7, 2020 questionnaire to Dr.

20  Fishel asked whether Goodman was able to fulfill the following occupational demands: "[l]ifting,

21  carrying, pushing, and pulling 10 pounds occasionally, mostly sitting, and standing or walking for

22  brief periods of time." Dkt No. 16-23 at 46. Notably absent from this list is any inquiry into

23  Goodman's ability to exercise frequent near visual acuity or to perform cognitively demanding

24  management tasks, even though Unum itself had identified these as job requirements. *See* Dkt. No.

17 at 15; Dkt. No. 17-6 at 12. "As many courts have noted, some sedentary occupations simply require much higher cognitive functioning levels than others." *Brown v. Unum Life Ins. Co. of Am.*, 356 F. Supp. 3d 949, 968 n.18 (C.D. Cal. 2019) (collecting cases). Given the absence of those items from the list, Dr. Fishel's questionnaire response does not contradict Dr. Kadet's responses as Unum claims. *See* Dkt. No. 31 at 15 ("Dr. Kadet's inconsistency with Dr. Fishel is particularly significant."). Dr. Fishel's later response on December 14, 2020 merely confirmed that nothing had changed since his last response, and thus does not provide any additional support for Unum's position. Dkt. No. 17-13 at 44.

(7) In addition to the questionnaire responses from Dr. Fishel and Dr. Kadet, Unum argues that Dr. Glisky opined that Goodman could return to work on July 1, 2018, and "never revised that opinion." Dkt No. 31 at 10. To the contrary, in the June 2019 neuropsychological evaluation, Dr. Glisky recommended that Goodman "not return to her previous level of occupation functioning" because her "cognitive, physical, and emotional symptoms will make it very difficult for her to successfully perform her job, and the stress will not be good for her continued recovery." Dkt. No. 16-11 at 6. Dr. Glisky recommended at that time that Goodman take another three to six months of leave and return for a follow-up evaluation. *Id.*

(8) After deciding that Goodman's entitlement to LTD benefits was ripe for reevaluation, Unum solicited reports from Dr. Brown and Dr. Lewis, who opined that Goodman's disability was not supported by the medical records. *See* Dkt. No. 17 at 53–55 (Brown Report), 58–60 (Lewis Review); Dkt. No. 17-5 at 78–80 (Brown Addendum), 83–84 (Second Lewis Review). Neither Dr. Brown nor Dr. Lewis examined Goodman personally; rather, to reach their conclusions, both relied heavily on the questionnaire responses already discussed and on the belief that Goodman's out-of-work activities were inconsistent with her diagnoses and reported symptoms. Specifically, Dr. Brown found that:

> Claimant is able to compose thoughtful, relevant and grammatically correct social media posts, care for and home school her 5-year-old special needs child as a single mom with shared custody, watch movies, use her smart phone to keep in touch with family and friends, do yoga at home, perform ADLs, do some reading, drive, and shop at Trader Joe's and Costco.

Dkt. No. 17 at 54. Unum's reliance on a "purer paper" review of Goodman's medical condition is minimally persuasive. *See Chapin v. Prudential Ins. Co. of Am.*, No. 2:19-CV-01256-RAJ, 2021 WL 1090749, at \*9 (W.D. Wash. Mar. 22, 2021); *Reetz v. Hartford Life & Accident Ins. Co.*, 294 F. Supp. 3d 1068, 1083 (W.D. Wash. 2018). In addition, the activities Dr. Brown describes establish that Goodman is not bedridden, but there is a significant gap between those activities and the demands of Goodman's full-time job. Goodman's ability to perform these activities does not demonstrate that she is able to perform the demands of her position on a full-time basis. *See Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 906 (9th Cir. 2016) (activities of daily living do not "necessarily establish an ability to work within the meaning of the Plan"). Reiterating this argument, Unum references one of Goodman's social media posts from April 6, 2020 to cast doubt on Dr. Kadet's findings that her reading and writing skills were at an elementary school level, Dkt. No. 31 at 18, but Unum provides no evidence about how Goodman's social media posts were composed, whether she had assistance, or how much difficulty she faced in putting them together. In the absence of such evidence connecting the social media posts to Goodman's actual occupational abilities, the posts themselves have limited evidentiary value. *See, e.g.*, *Holmgren v. Sun Life & Health Ins. Co.*, 354 F. Supp. 3d 1018, 1033 (N.D. Cal. 2018) (rejecting insurer's argument that "social media activity is evidence of cognitive ability").

(9) In the wake of Goodman's appeal, Unum solicited the opinion of Dr. Norris, who found that Dr. Kadet's report lacked credibility because of certain inconsistencies in the medical record. Specifically, Dr. Norris found that the severity of the visual symptoms was inconsistent with Goodman's ability to perform various daily tasks, with her normal MRI results in March 2018,

1    and with Dr. Kadet's failure to refer her to an ophthalmologist. Dkt. No. 20-7 at 39, 41 (referencing

2    Goodman's "report of doing paperwork, helping her child w[ith] schoolwork, using a computer,

3    seeing dashboard instruments while driving, and participating in multiple video sessions for Visual

4    Therapy"). As with Dr. Brown's opinion, the evidence cited in Dr. Norris's opinion showing that

5    Goodman was apparently able to complete various tasks of daily living does not establish that she

6    was able to perform the evidently more demanding tasks required for full-time employment

7    involving frequent near acuity. As for Dr. Kadet's failure to refer Goodman to an ophthalmologist,

8    Dr. Kadet clearly indicated in his report that he believed neuro-optometric rehabilitation/vision

9    therapy was the "treatment of choice." Dkt. No. 16-6 at 29. Given that Dr. Kadet had identified an

10    appropriate treatment recommendation, and that he believed the "condition [could] be successfully

11    treated" using that treatment, *id.* at 30, it makes sense that Dr. Kadet did not find further referrals

12    to be necessary. And it is true that Goodman's MRIs in March 2018 did not find nerve damage,

13    but this does not invalidate Goodman's consistent reports of visual symptoms, and Dr. Kadet's

14    report offers the best explanation of those symptoms consistent with the medical evidence. *See*

15    *Anderson*, 116 F.Supp.3d at 1238 ("Vertigo, fatigue, and nausea are subjective experiences that

16    cannot be easily measured by an objective standard, but that does not mean such symptoms should

17    be discounted or disbelieved.").

18          (10) Unum proposes an alternative explanation for Goodman's reported symptoms: it

19    contends that her disability was a mental illness, and that her subjectively reported symptoms are

20    unreliable. *See* Dkt. No. 31 at 18–20 (questioning Goodman's reliability); Dkt. No. 42 at 9 ("Dr.

21    Kadet failed to consider whether any limitations Plaintiff experienced in December 2020 were due

22    to Plaintiff's diagnosed mental illness."). The evidence does establish that Goodman suffered from

23    mental illness concomitant to her visual symptoms. *See* Dkt. No. 16-11 at 5 (diagnosing Goodman

24    with Unspecified Neurocognitive Disorder, Unspecified Depressive Disorder, and Unspecified

Anxiety Disorder). The record also establishes that Goodman's reported symptoms were variable

and sometimes inconsistent with the medical evidence. *See, e.g.*, Dkt. No. 17 at 43, 44 (finding by

the ALJ ruling on Goodman's 2019 SSA disability application that "[t]he claimant's activities are

not entirely consistent with her allegations" and that she gave "inconsistent testimony regarding

driving and vision problems"). Goodman's inconsistent reports may stem from the mental illnesses

that afflicted her over the benefits period. However, the inconsistencies in Goodman's reporting

of her symptoms are not so great as to suggest that her symptoms were trivial or nonexistent. In

fact, the ALJ who considered Goodman's 2019 social security disability benefits claim made

extensive note of those inconsistencies, but ultimately found that the "medical evidence is partially

consistent with the claimant's allegations," and that it "suggests limitations, but does not reflect

[the] level of functional restriction alleged by the claimant." *Id.* at 41. The ALJ ultimately found

that Goodman was "unable to perform past relevant work as actually or generally performed."[1] *Id.*

at 45. Unum also surmises that Goodman's self-treatment with unorthodox remedies such as

unprescribed drugs and a hyperbaric chamber may have contributed to her symptoms, Dkt. No. 39

at 6, but it does not submit any medical evidence indicating that her symptoms could be caused by

such treatments.

---

[1] Unum argues that the Court should discount the October 26, 2020 SSA decision because this Court overturned its finding that Goodman "cannot work in a job that requires more than occasional reading or reading above a 5th grade level." *See* Dkt. No. 39 at 13. However, the Court took issue with that portion of the decision, at least in part, in response to Goodman's argument that "the ALJ erred in finding that Dr. Kadet limited [her] to fifth-grade reading, when Dr. Kadet clearly indicated that she was limited to third-grade reading." *Tanya G. v. Comm'r of Social Security*, C21-0530-SKV, 2022 WL 35494, at *3 (W.D. Wash. Jan. 3, 2022). The Court ultimately found that "Dr. Kadet's opinion does not clearly define Plaintiff's overall reading ability. Dr. Kadet summarized variable test results as to reading fluency, reading speed, and reading efficiency, but did not opine as to Plaintiff's overall reading level for purposes of vocational functioning." The Court thus concluded that "there is no clear basis for boiling down Dr. Kadet's report into an opinion that Plaintiff could read at the fifth-grade level." *Id.* The Court further notes that in June 2022, the SSA found that Goodman was totally disabled under its standard for determining disability. *See* Dkt. No. 34-4 at 11.

ORDER GRANTING IN PART PLAINTIFF TANYA GOODMAN'S MOTION FOR JUDGMENT ON THE RECORD - 23

1      (11) Unum further argues that Goodman failed to obtain regular care for her disability, as

2  required by the Plan language. *See* Dkt. No. 31 at 20–21; Dkt. No. 18-11 at 16, 31. Under this

3  "regular care" requirement, Goodman was required to (i) "personally visit a physician as

4  frequently as is medically required, according to generally accepted medical standards, to

5  effectively manage and treat [her] disabling condition," and (ii) receive "the most appropriate

6  treatment and care which conforms with generally accepted medical standards" for her condition.

7  Dkt. No. 18-11 at 31. The record reflects that Unum communicated to Goodman its belief that she

8  was not complying with the regular care requirement, but it only did so with respect to regular care

9  for Goodman's mental health. *See* Dkt. No. 16-13 at 44–45. Unum did not notify Goodman that it

10  believed she was failing to receive regular care for her visual symptoms. In fact, Goodman's course

11  of treatment reflects more regular medical care than courts have typically found to violate similar

12  requirements in ERISA plans. *See, e.g.*, *Eichacker v. Paul Revere Life Ins. Co.*, 354 F.3d 1142,

13  1148 (9th Cir. 2004) (claimant meets a regular care requirement when they make "good faith

14  efforts to seek care in the aftermath of the accident," but not when they fail to receive "any

15  physician's care whatsoever during the period in dispute").

16      (12) The Court concludes that Goodman has established by a preponderance of evidence

17  that she was disabled under the terms of the Plan at least through December 16, 2020, when Unum

18  terminated her LTD benefits. This determination is based on the Plan's definition of disabled under

19  the "regular occupation" standard.  However, Unum terminated Goodman's benefits under the

20  "mental illness" 24-month limitation and has never made a determination regarding whether

21  Goodman meets the more stringent standard that the Plan imposes for continuing to pay disability

22  benefits beyond 24 months, at which point a Plan participant is disabled only if they are "unable

23  to perform the duties of *any gainful occupation* for which [the participant] is reasonably fitted by

24  education, training or experience." Dkt. No. 18-11 at 16 (emphasis added); *see* Dkt. No. 31 at 3

ORDER GRANTING IN PART PLAINTIFF TANYA GOODMAN'S MOTION FOR JUDGMENT ON THE
RECORD - 24

n.5. Therefore, the Court remands the case to Unum to determine whether it is required to extend benefits to Goodman beyond the 24-month period in which the "regular occupation" standard applies. *See, e.g.*, *Anderson*, 116 F.Supp.3d at 1239.

**C.      Claim for Breach of Fiduciary Duty and Injunctive Relief**

(13) Goodman is not entitled to judgment on the record for her claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3). Section 1132(a)(3) is a "'catchall' provision to offer appropriate equitable relief for injuries that § 1132 does not otherwise remedy." *Wit v. United Behavioral Health*, No. 20-17363, 2023 WL 411441, at *9 (9th Cir. Jan. 26, 2023) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 511–12, 515 (1996)). The Ninth Circuit has held that "a claimant may not bring a claim for denial of benefits under § 1132(a)(3) when a claim under § 1132(a)(1)(B) will afford adequate relief." *Castillo v. Metro. Life Ins. Co.*, 970 F.3d 1224, 1229 (9th Cir. 2020). Goodman argues that Unum engaged in misconduct in violation of its fiduciary duties in two ways: (i) by arbitrarily disregarding her treating doctors' opinions, and (ii) ignoring SSA findings of disability, and requests an injunction ordering Unum personnel to "undergo[] re-training to comply with the requirements of ERISA to consider treating providers' opinions and SSA disability determinations." Dkt. No. 33 at 22, 24.

(14) To the extent Goodman's breach of fiduciary duty claim is not subsumed by her claim for a denial of benefits under § 1132(a)(1)(B), the Court denies her request for an injunction. For the reasons explained above, the Court does not find Unum's position regarding Goodman's disability persuasive in the final instance. However, the record reflects that Unum had a reasoned basis for its rejection of the findings by Goodman's treating providers and the SSA in the reports by Dr. Brown, Dr. Lewis, and Dr. Norris. *See* Dkt. No. 17 at 53–55 (Brown Report), 58–60 (Lewis Review); Dkt. No. 17-5 at 78–80 (Brown Addendum), 83–84 (Second Lewis Review); Dkt. No. 20-7 at 37–42 (Norris Report). Goodman's (and the Court's) disagreement with Unum's

conclusions does not establish that Unum arbitrarily ignored that evidence. The Court thus denies Goodman's claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3). *Cf. Abrams v. Unum Life Ins. Co. of Am.*, No. C21-0980-TSZ, 2022 WL 17960616, at *5 (W.D. Wash. Dec. 27, 2022) ("Because multiple relevant pieces of evidence in this case support Defendant's denial, the Court concludes that Defendant did not act in bad faith.").

**CONCLUSION**

For the foregoing reasons, the Court GRANTS IN PART Goodman's motion for judgment on the record, GRANTS Goodman's motion to supplement the record, and DENIES IN PART Unum's motion for judgment on the record. The case is REMANDED to Unum to determine whether it is required to extend benefits to Goodman beyond the 24-month period in which the "regular occupation" standard applies.

Dated this 3rd day of May 2023.

Barbara Jacobs Rothstein
United States District Judge